**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

MONTROSE PARKWAY                           *
ALTERNATIVES COALITION, *et al.,*          *

   Plaintiffs,                *

     v.            *   Civil Action No. AW-05-3096

U.S. ARMY CORPS OF                         *
ENGINEERS, *et al.,*                       *

   Defendants.                *

      * * * * *

## <u>MEMORANDUM OPINION</u>

  This case stems from the construction of the Montrose Parkway, a proposed four-lane highway that will cross Montgomery County, Maryland.  Plaintiffs in the case are Montrose Parkway Alternatives Coalition, a Maryland nonprofit organization established to educate residents of Montgomery County about the environmental and quality of life issues surrounding the planned Montrose Parkway, as well as Steve Goldstein, Manuel and Nancy Zymelman, residents of the Montrose Woods development and Steve Epstein, a resident of Luxmanor (collectively, "Plaintiffs").  Defendants are the United States Army Corps of Engineers (the "Corps"), a federal agency responsible for regulating all dredging and filling activities in United States waters, Col. Robert Davis, Baltimore District Commander of the U.S. Army Corps, and Lt. General Carl A. Strock, Chief Engineer of the United States Army Corps of Engineers (collectively, "Defendants").  Montgomery County has intervened as a Defendant.  Plaintiffs' Complaint alleges that Defendants violated the National Environmental Policy Act and the Clean Water Act.  Currently pending before the Court is Plaintiffs' Motion for a Preliminary Injunction [2].  On December 12, 2005, the Court

held a hearing concerning the motion and heard from all the parties.  In addition, the Court heard from Montgomery County's expert witness, Jeffrey Lindsey, who gave testimony regarding the possible financial harm to the County if this Court were to enter a preliminary injunction in this case. Having considered this testimony as well as the arguments of Plaintiffs, Defendants and Montgomery County, this Court will deny Plaintiffs' Motion for Preliminary Injunction for the reasons set forth more fully below.

**FACTUAL AND PROCEDURAL BACKGROUND**

Montrose Parkway is a proposed four-lane divided highway to connect I-270 and Veirs Mill Road.  As planned, the Montrose Parkway would be constructed in three phases.  The first segment, referred to as Montrose Parkway West, would consist of a new four-lane divided highway between Tildenwood Drive and Old Old Georgetown Road.  The second segment, referred to as the Maryland Route 355/Montrose Interchange would connect Montrose Parkway West to Randolph Road. Finally, the third segment, referred to as Montrose Parkway East, would consist of a new four-lane divided highway between Randolph Road and Veirs Mill Road.

The Montrose Parkway project is set to be funded and constructed entirely by Montgomery County.  Montgomery County has only sought approval from the federal government for the .94 acres of wetlands impacted by the construction of Montrose Parkway West.

On March 22, 2004, the Montgomery County Department of Public Works and Transportation ("Montgomery County") submitted an application to the Maryland Department of the Environment and the Corps to proceed with Montrose Parkway West.  This application sought a Nontidal Wetlands permit from the Maryland Department of the Environment and a Clean Water Act Section 404 permit from the Corps under the terms of the Maryland State Programmatic General

Permit, which allows projects that have a minimal impact on the environment and impact less than one acre of wetlands to proceed without further review under the National Environment Policy Act ("NEPA").

The Corps held a public hearing regarding Montgomery County's application for a Maryland Department of the Environment and Corps permit for the Montrose Parkway West project. The Corps used the public comments from the hearing in the preparation of an Environmental Assessment for Montrose Parkway West.

On September 7, 2005, the Army Corps of Engineers issued a Section 404 permit that authorized Montgomery County to discharge fill materials into .94 acres of jurisdictional waters of the United States to construct a crossing of a perennial tributary to Old Farm Creek and a crossing of an unnamed intermittent tributary.[1]   The permit included an Environmental Assessment, Statement of Findings, and a review and compliance determination under the Army Corp of Engineers' Section 404(b) Guidelines.  The Environmental Assessment confined its analysis to the crossings of jurisdictional streams and wetlands, including aquatic resources, and a limited amount of roadway approaching the two crossings. (Compl. ¶ 25.)   In addition, the Army Corps of Engineers' Environmental Assessment only considered the impact of the construction of Montrose

---

[1] By statute, the Corps may issue permits pursuant to its authority under 33 U.S.C. § 1344, which states:

> The Secretary may issue permits, after notice and opportunity for
> public hearings for the discharge of dredged or fill material into
> the navigable waters at specified disposal sites. Not later than the
> fifteenth day after the date an applicant submits all the information
> required to complete an application for a permit under this
> subsection, the Secretary shall publish the notice required by this
> subsection.

33 U.S.C. § 1344 (2005).

Parkway West, not the larger Montrose Parkway project.

Plaintiffs moved for a temporary stay of construction activity, which the Maryland Office of Administrative Hearings denied on October 17, 2005. As of the present date, construction of Montrose Parkway West has commenced.

Montgomery County has stated that Montrose Parkway West will "significantly relieve congestion on existing Montrose Road and provide access to North Bethesda." In addition, the State of Maryland has approved a "separate grade separated interchange project" for Maryland 355, a state road, that would require the State to tear out a portion of Montrose Parkway West from Old Old Georgetown Road to Randolph Road. "Rather than expend funds for work that would be torn out for another project, Montgomery County has elected to phase the Montrose Parkway West project so that it terminates at its intersection with Old Old Georgetown Road." Although the State has received approval for the interchange project, Montgomery County plans to build between Montrose West Parkway from Old Old Georgetown Road to Randolph Road if the State chooses not to proceed with the Maryland 355 grade separation.

On November 15, 2005, Plaintiffs filed a Complaint and Motion for Temporary Restraining Order and Preliminary Injunction. In the Complaint, Plaintiffs allege that the Corps violated the National Environmental Policy Act and the Clean Air Act by: (1) failing to consider the impact of the construction of the Montrose Parkway West as a whole and the cumulative impact of the proposed new interchange between Montrose Parkway and Maryland Route 355 and (2) failing to provide the public either with notice or an opportunity to comment on its Environmental Assessment prior to its Finding of No Significant Impact ("FONSI"). The Complaint requests that this Court grant declaratory relief under NEPA and the Clean Water Act, invalidating the Section 404 permit

the Corps issued on September 7, 2005. The Complaint also requests that this Court remand the case for further administrative action to officially suspend or revoke the September 7, 2005 permit. Finally, the Complaint seeks injunctive relief and asks the Court to preliminarily and permanently enjoin Defendants from issuing or reissuing any permits relating to the Montrose Parkway West project until Defendants can demonstrate compliance with NEPA, the Clean Water Act, and the applicable implementing regulations. Plaintiffs' Motion also alleges that "[o]n information and belief, the County is now poised to construct a bridge over Old Farm Creek . . . which will result in the irreparable destruction of federally-protected wetlands."

This Court denied Plaintiffs' request for a Temporary Restraining Order on November 17, 2005, but ordered the parties to submit a briefing schedule for a hearing on the Preliminary Injunction. While Plaintiffs' Complaint avers that Defendants violated NEPA and the Clean Water Act, the Motion for Preliminary Injunction focuses solely on the likelihood of success of the NEPA claims.

## **STANDARD OF REVIEW**

To determine the appropriateness of a preliminary injunction, the four-part test established in *Blackwelder Furniture Co. v. Seileg Mfg. Co., Inc.*, 550 F.2d 189 (4th Cir. 1977) requires courts in this Circuit to weigh:

> (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied;
> (2) the likelihood of harm to the defendant if the requested relief is granted;
> (3) the likelihood that the plaintiff will succeed on the merits; and
> (4) the public interest.

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811-12 (4th Cir. 1991) (internal quotations and citations omitted); *see also Blackwelder*, 550 F.2d at 193-95.

The balance of harm analysis should precede any inquiry into the likelihood of success on the merits. *Direx*, 952 F.2d at 813. Therefore, as a initial matter, the Court must determine whether the plaintiff has demonstrated irreparable harm by "clear and convincing evidence" in order to obtain relief. *Id.* at 818. If the plaintiff makes such a showing, the court must then balance the likelihood of harm to the plaintiff against the likelihood of harm to the defendant. *See Scotts Co. v. United Industries Co.*, 315 F.3d 264, 271 (4th Cir. 2002); *Direx,* 952 F.2d at 812. Weighing the relative harm to the defendant against the harm to the plaintiff:

> If the balance of the hardships tips decidedly in favor of the plaintiff, then typically it will be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation. But if the balance of hardships is substantially equal as between the plaintiff and defendant, then the probability of success begins to assume real significance, and interim relief is more likely to require a clear showing of a likelihood of success.

*Scotts*, 315 F.3d at 271 (internal citations and quotations omitted). Where the balance of hardships does not tip decidedly or significantly in favor of the plaintiff, the plaintiff must prove "a probability (not mere possibility) of success of the ultimate trial on the merits. 'Probability of success' implies that the plaintiff must have a very clear and strong case." *Direx,* 952 F.2d at 813 (internal quotations omitted).

After balancing the harms and determining the likelihood of success on the merits, the court must analyze the final factor, the public interest. *Direx*, 952 F.2d at 814.

## DISCUSSION

I.    **National Environmental Protection Act of 1969**

The National Environmental Protection Act, enacted in 1969, represents the culmination of efforts, beginning in the late 1950s, to protect our natural environment. *See* Matthew J. Lindstrom, *Procedures Without Purpose: The Withering Away of the National Environmental Policy Act's Substantive Law*, 20 J. Land. Resources & Envtl. L. 245, 248 (2000). NEPA enjoyed widespread support, and President Nixon signed NEPA into law on January 1, 1970 on national television. *See* Lindstrom, *supra*, at 245. Indeed, one commentator has described NEPA as the "Magna Carta" of environmental law. *See* Daniel R. Mandelker, *NEPA Law and Litigation: The National Environmental Policy Act* § 1:01 (2d ed. 1984).

NEPA reflects our national commitment to curbing unfettered "growth" and mandates that agencies examine the environmental consequences of federal actions. To this end, the statute provides that:

> [t]he Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall–
> . . .
> **(C)** include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--
>
> **(i)** the environmental impact of the proposed action,
>
> **(ii)** any adverse environmental effects which cannot be avoided should the proposal be implemented,
>
> **(iii)** alternatives to the proposed action,
>
> **(iv)** the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term

productivity, and

(**v**) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

. . .

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction

(**E**) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources . . . .

42 U.S.C. § 4332 (2005).

While NEPA establishes "significant substantive goals for the Nation," the Supreme Court has reiterated that NEPA imposes procedural duties on agencies, designed "to insure a fully informed and well-considered decision." *See Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978). NEPA does not compel a court to invalidate an agency decision that differs from "the decision this Court would have reached. . . [as a] member[] of the decisionmaking unit of the agency." *Id.*; *see also Strycker's Bay Neighborhood Council, Inc. v. City of New York*, 444 U.S. 223, 227-28 (1980).

It is against this background that the Court considers Plaintiffs' claims that Defendants violated NEPA's public participation requirements and impermissibly limited the scope of its Environmental Assessment.

II.     **Plaintiffs' Likelihood of Success on the Merits**

The extent and nature of Plaintiffs' harm is inextricably linked to the merits of Plaintiffs' suit.  Plaintiffs have alleged that they suffered a harm when the Corps approved the permit in violation of NEPA's provisions.  As the violation constitutes Plaintiffs' purported harm, this Court must begin its analysis with the likelihood that Plaintiffs will succeed on the merits of the case.

Because NEPA does not have a civil enforcement provision, this Court may only issue a preliminary injunction if the Corps' actions violated the Administrative Procedure Act, 5 U.S.C. §§ 701 to 706.  Thus, to prevail, Plaintiffs must show that the agency's action was "arbitrary and capricious, an abuse of discretion, or contrary to law."  5 U.S.C. § 706(2)(A).

A.

Plaintiffs first argue that the Corps acted arbitrarily and capriciously, alleging that the Corps failed to take the requisite "hard look" at the full scope of the environmental impact of the Montrose Parkway West project.  *Cf. Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) ("The sweeping policy goals announced in § 101 of NEPA are thus realized through a set of 'action-forcing' procedures that require that agencies take a 'hard look' at environmental consequences . . . and that provide for broad dissemination of relevant environmental information.  Although these procedures are almost certain to affect the agency's substantive decision, it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." (internal citations and quotations omitted)).  Pursuant to NEPA's implementing regulations, the Corps may demonstrate its compliance with the statute by issuing an Environmental Assessment

("EA")[2] if the Corps makes a Finding of No Significant Impact ("FONSI")[3] on the environment or issuing a more detailed Environmental Impact Statement ("EIS").

The Corps' regulations provide that:

> FONSI shall be prepared for a proposed action, not categorically excluded, for which an EIS will not be prepared. The FONSI will be a brief summary document . . . . In the case of operation and maintenance activities involving the discharge of dredged or fill material requiring a public notice, the notice will indicate the availability of the EA/FONSI.

---

[2] The implementing regulations to the National Environmental Policy Act define an Environmental Assessment and state:

> "Environmental Assessment":
> (a) Means a concise public document for which a Federal agency is responsible that serves to:
> (1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.
> (2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.
> (3) Facilitate preparation of a statement when one is necessary.
> (b) Shall include brief discussions of the need for the proposal, of alternatives as required by sec. 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

40 C.F.R. § 1508.9.

[3] The regulations also define "Finding of No Significant Impact" or FONSI as:

> a document by a Federal agency briefly presenting the reasons why an action, not otherwise excluded (§ 1508.4), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared. It shall include the environmental assessment or a summary of it and shall note any other environmental documents related to it (§ 1501.7(a)(5)). If the assessment is included, the finding need not repeat any of the discussion in the assessment but may incorporate it by reference.

40 C.F.R. § 1508.13.

33 C.F.R. § 230.11.  The Corps procedures also make clear that most permits "normally require only an EA."  33 C.F.R. § 230.7(a).  In interpreting these regulations, in light of the overarching purpose of NEPA, the Fourth Circuit has explained that an agency takes a "hard look" "when it obtains opinions from its own experts, obtains opinions from experts outside the agency, gives careful scientific scrutiny and responds to all legitimate concerns that are raised."  *Hughes River Watershed Conservancy v. Johnson,* 165 F.3d 283, 288 (4th Cir. 1999) (citing *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378-85 (1989)).  "As long as the adverse environmental effects of a proposed action are sufficiently identified and evaluated, an agency is vested with discretion to determine under NEPA that other values outweigh the environmental costs."  *Id.* (internal citations omitted).  In addition, a court must defer to an agency's decision to rely on an EA instead of preparing an EIS.  *See Mt. Lookout-Mt. Nebo Property Protection Ass'n v. FERC*, 143 F.3d 165, 172 (4th Cir. 1998).

The record reflects that the Corps took a "hard look" at the environmental impact of the Montrose Parkway West.  In the EA, the Corps stated that it received comments not only from its own experts, but from the United States Fish and Wildlife Service, the State Historic Preservation Officer, the National Capital Park and Planning Commission, as well as from Plaintiffs.  In addition, the Corps' EA included an analysis of many of the concerns Plaintiffs have raised.  Specifically, the EA weighed the project's impact on wildlife, wetlands and streams, land use, safety, and secondary and cumulative impacts.  After considering these and other factors, the Corps concluded that:

> Impacts to wetlands have been minimized through the use of bridging, retaining walls, and underground stormwater management control. The .14 acre of temporarily disturbed wetlands would be restored upon completion of construction. The .2 acres of permanently destroyed wetlands would be replaced with created

wetlands at a 1:1 ratio.  In addition, a bioretention facility would be
constructed to treat the runoff from a parking lot near Tilden Lane,
and 1200 feet of Booze Creek would be restored to stabilize the
banks and protect exposed sanitary sewers in the stream bed.

Corps 404 Permit, at 23.

Plaintiffs believe that the holding in *Arlington Coalition on Transportation v. Volpe*, 458

F.2d 1323 (4th Cir. 1972) provides support for their position that a preliminary injunction should

issue.  This Court disagrees.  The dispute in *Arlington Coalition* arose out of the construction of

portions of Interstate I-66, a six-lane highway; the I-66 project was part of the Federal Interstate

Highway System and funded almost exclusively by the federal government.  *Id.* at 1328.  In addition,

in *Arlington Coalition*, Defendants had not assessed any of the environmental impacts of the

proposed highway before proceeding with the highway project.  *Id.* at 1330 ("It is undisputed that

prior to the filing of this suit no Section 102(C) statement had been prepared for the project in

question.  It is also uncontested that this six-to-eight-lane highway is a 'major Federal action

significantly affecting the quality of the human environment'").  In sum, *Arlington Coalition* stands

for the proposition that the federal government cannot fund and build a major interstate highway

without complying with NEPA and preparing an EIS.  This case, however, does not hold that a

federal agency must prepare an EIS for all state-funded projects that require federal approval.

Nor does this Court adopt the view advanced by Plaintiffs that Montgomery County's

authorization of construction shortly after receiving the Corps' permit indicates that Defendants did

not comply with NEPA.  Plaintiffs contend that the case of *Maryland Conservation Council v.

Gilchrist*, 808 F.2d 1039 (4th Cir. 1986) counsels in favor of granting their request for a preliminary

injunction.  The *Gilchrist* court looked at a myriad of factors to determine that the highway designed

to pass through a state park qualified as a major "federal action" within the meaning of NEPA.  In

12

*Gilchrist*, Montgomery County sought to build the Great Seneca Highway through a state park and had used federal funds to purchase much of the park land. *Id.* at 1040-41, 1042. To complete the highway, the County needed federal approval from the Secretary of the Interior to convert park land to another outdoor recreation use and from the Secretary of the Army to dredge wetlands. *Id.* at 1042. In addition, in *Gilchrist,* the County anticipated that it might seek additional federal funds, and the Transportation Act would require the Secretary of Transportation to approve the use of park land for a transportation program. *Id.* After analyzing all of these facts, the Fourth Circuit reasonably concluded that the construction of the Great Seneca Highway constituted a "major federal action" that required the preparation of an EIS before any construction on the highway would begin. *Id.* at 1042.

Yet, the factual differences between that case and the current dispute render *Gilchrist* inapposite. In *Gilchrist*, unlike here, the County needed to seek approval from multiple federal agencies to build the Great Seneca Highway and sought federal funds for the project. These facts transformed a local highway project into "a major federal action." In this case, the Corps was not involved in the planning or construction of the proposed roadway. Also, in *Gilchrist*, the County planned to proceed with construction *before* the Secretary of Transportation completed an EIS. Here, the Corps completed an EA after deciding an EIS was not necessary, and Montgomery County issued the notice to proceed once the Corps approved the County's request for a 404 permit. Nothing in the record suggests that Montgomery County *began* construction of the project before the issuance of the Corps' EA.

Although the Corps did not prepare the type of detailed environmental statement that the Plaintiffs would have liked, the facts in the record do not substantiate Plaintiffs' claim that the Corps

violated NEPA.

B.

Plaintiffs also contend that the Corps did not comply with NEPA's public participation requirements.  In support of this argument, Plaintiffs cite Council on Environmental Quality ("CEQ") guidance, which suggests that an EA should be made available for public review in advance of an agency's decision whether to issue an EIS.  *See Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18,026 (1981). However, as both Defendants and Intervenor have pointed out, this guidance does not apply to the Corps.  The relevant regulations only require that the Corps involve the public "to the extent practicable."  *See* 40 C.F.R. § 1501.4(b).  Moreover, the vast majority of circuits addressing this issue have found that the regulations do not require an agency to circulate an EA for public comment.  *See*, *e.g.*, *Alliance to Protect Nantucket Sound v. United States Dept. of Army*, 398 F.3d 105, 115 (1st Cir. 2005) (no requirement to circulate a draft EA); *Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257, 1279 (10th Cir. 2004) (same); *see also Pogliani v. United States Army Corps of Eng'rs*, 306 F.3d 1235, 1238-39 (2d Cir. 2002); *Como-Falcon Cmty. Coalition v. Dep't of Labor*, 609 F.2d 342, 345 (8th Cir. 1979).

As one case cited by Plaintiffs explains:

> [A]lthough the [NEPA] regulations do not require circulation of a draft EA, they do require that the public be given as much environmental information as is *practicable*, prior to completion of the EA, so that the public has a sufficient basis to address those subject areas that the agency must consider in preparing the EA. . . . The way in which the information is provided is less important than that a sufficient amount of environmental information--*as much as practicable*--be provided so that a member of the public can weigh in on the significant decisions that the agency will make in preparing

14

the EA.

*Sierra Nevada Forest Protection Campaign v. Weingardt,* 376 F. Supp. 2d 984, 991 (E.D. Cal. 2005) (emphasis added).

In fact, the Corps did provide an opportunity for Plaintiffs to comment on Montgomery County's permit application. Plaintiffs contend that the Public Notice provided only generalized information, but the notice gave details about the expected impacts to aquatic resources and was accompanied by maps of the proposed areas of construction. That the notice did not contain specific facts about the proposed EA does not make Montgomery County's Public Notice *per se* defective under NEPA. *See, e.g., Providence Road Community Ass'n. v. EPA*, 683 F.2d 80, 82 (4th Cir. 1982) (holding that notice of a hearing that included planning documents and did not disclose location of proposed project complied with NEPA's requirements). Plaintiffs have described this notice as *pro forma* and lacking, but the notice described the full extent of the work as well as the Maryland 355 project. Furthermore, Plaintiffs have not stated what additional relevant information they would have presented during the notice period had the Public Notice contained more environmental information about the Montrose Parkway West project. Under these circumstances, this Court cannot agree with Plaintiffs that the Public Notice was deficient as a matter of law.

## C.

Finally, Plaintiffs claim that the Army Corps erroneously refused to consider the impact of the entire Montrose Parkway project rather than the two crossings in its jurisdiction. In essence, Plaintiffs claim that Defendants segmented the project to minimize its environmental impact.

By its own terms, NEPA only governs major federal actions. *See* 42 U.S.C. § 4332. As previously discussed, courts have recognized that federal participation may federalize the entire

project.  *See, e.g.*, *Gilchrist*, 808 F.2d 1039 (holding federal involvement in construction of state roadway made project major federal action); *Arlington Coalition on Transportation v. Volpe*, 458 F.2d 1323 (holding construction of interstate highway with federal funds through state was a federal action); *see also* Mandelker, *supra*, § 8:19.

While a non-federal project may be transformed into a federal action, it does not follow that all construction that requires federal approval becomes "federalized." *Winnebago Tribe of Nebraska v. Ray,* 621 F.2d 269 (8th Cir. 1980), represents a leading case on this issue.  In *Winnebago Tribe*, the appellees, Nebraska Public Power District, planned to construct a transmission line and applied to the Corps for a permit for a portion of the project that would cross the Missouri River.  *Id.* at 270. Granting the permit, the Corps prepared an environmental effect assessment that only examined the environmental effects on the  river-crossing portion of the line, or approximately 1.25 miles out of a 67 mile project.  *Id.*  The Eighth Circuit upheld the Corps' decision to confine the scope of its environmental review, reasoning that "Corps did not have sufficient control and responsibility to require it to study the entire project." *Id.* at 272; *see also Wetlands Action Network v. United States Army Corps of Eng'rs,* 222 F.3d 1105, 1115 (9th Cir. 2000) (holding that the Corps did not have to evaluate environmental impact of all three phases of a project when it issued a permit to fill over 16.1 acres wetlands); *Save the Bay, Inc. v. United States Army Corps of Eng'rs*, 610 F.2d 322 (5th Cir. 1980) (holding that the Corps' decision to issue pollution permit to discharge effluents was not enough to "federalize" private construction); Mandelker, *supra*, § 8:19.

In response to these cases and the confusion over this precise issue, the Corps revised its regulations to define the scope of the Corps' NEPA review of regulatory actions.  *See* 53 Fed. Reg. 3,120-01.  These regulations prove instructive and state that:

> For those regulated activities that comprise merely a link in a transportation . .  project, the scope of analysis should address the Federal action, i.e., the specific activity requiring a DA permit and any other portion of the project that is within the control or responsibility of the Corps of Engineers (or other Federal agencies).

> For example, a 50-mile electrical transmission cable crossing a 1 1/4 mile wide river that is a navigable water of the United States requires a DA permit. Neither the origin and destination of the cable nor its route to and from the navigable water, except as the route applies to the location and configuration of the crossing, are within the control or responsibility of the Corps of Engineers.  Those matters would not be included in the scope of analysis which, in this case, would address the impacts of the specific cable crossing.

> Conversely, for those activities that require a DA permit for a major portion of a transportation or utility transmission project, so that the Corps permit bears upon the origin and destination as well as the route of the project outside the Corps regulatory boundaries, the scope of analysis should include those portions of the project outside the boundaries of the Corps section 10/404 regulatory jurisdiction. To use the same example, if 30 miles of the 50-mile transmission line crossed wetlands or other "waters of the United States," the scope of analysis should reflect impacts of the whole 50-mile transmission line.

33 C.F.R. Part 325, App. B, § 7(b)(3).  Both the caselaw and the Corps regulations make clear that the Corps has an obligation to assess non-jurisdictional aspects of a project *only* if the Corps has significant "control and responsibility" over those portions of the project.

Plaintiffs do not ask this Court to invalidate the Corps' regulations, and the Corps' determination of the proper scope of the environmental review is entitled to deference.  *See Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 375-76 (1989) (holding that courts should defer the Corps' decision not to issue a second supplemental EIS); *see also Wetlands Action Network*, 222 F.3d at 1115 (9th Cir. 2000) (stating that the Corps' decision to limit scope of environmental review is accorded deference).  This case closely resembles the first example in the Corps' NEPA

regulations.  The Corps lacks control over the entire Montrose Parkway West project.  Rather, its jurisdiction extends only to the navigable waters, or the project's crossing with Old Farm Creek and the unnamed intermittent tributary.  The wetlands are not interspersed throughout, but only intersect with a small area of the proposed roadway.  *Cf. Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1121-24 (9th Cir. 2003) (upholding a district court ruling that the Corps improperly confined its NEPA analysis where federal waters ran throughout the proposed site and where two federal agencies objected to the Corps' acreage limitations).  Also, it appears significant that the Environmental Protection Agency, United States Fish and Wildlife Services, National Marine Fisheries Service, and the State Historic Preservation Officer did not object to the Corps' decision to limit its analysis to the two jurisdictional crossings.  Corps 404 Permit, at 5.  The Corps' regulations expressly contemplate the appropriate scope of the Corps' environmental review for this type of construction and state that projects such as Montrose Parkway West are not federalized. Therefore, the Corps' decision to examine the jurisdictional crossings was not arbitrary and capricious.

Although Plaintiffs argue that the Corps did not comply with NEPA's procedural requirements, environmental jurisprudence simply does not provide a firm basis for this assertion. The Corps gave Plaintiffs an opportunity to voice their concerns about the Montrose Parkway West proposal and even incorporated some of these comments into the EA.  All this evidence indicates that the Corps seriously considered the environmental impact of issuing the permit, and, as such, Plaintiffs have not demonstrated a strong likelihood of success on the merits of this case.  *Cf. Stryker's Bay Neighborhood Council*, 444 U.S. at 227 ("[O]nce an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has

considered the environmental consequences; it cannot interject itself within the area of discretion of the executive."); *see also Fund For Animals, Inc. v. Rice*, 85 F.3d 535, 545-46 (11th Cir. 1996) (same).

### III.   __Plaintiffs' Alleged Harm__

Plaintiffs have alleged that injunctive relief is needed to prevent Montgomery County from "irreparably harming the environment."  In particular, Plaintiffs assert that construction of the Montrose Parkway West would irreparably harm the natural character and aquatic resources of Old Farm Creek and the upland forests and habitat.  (Pl. Mtn. Prelim. 16.)

In a suit brought to enforce NEPA, failure of appropriate federal decision-makers to take environmental harm into account constitutes irreparable harm.  *See Jones v. D.C. Redevelopment Land Agency*, 499 F.2d 502, 512 (D.C. Cir. 1974).  Though an environmental injury often times is irreparable, presuming irreparable harm in all environmental cases would contravene traditional equitable principles.  *See Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 544-45 (1987). Even in an environmental case, the party seeking the injunction still bears the burden of showing that the balance of harms favors granting the requested relief.

This Court has found that Plaintiffs have not made a strong showing that a NEPA violation has occurred.  This Court, however, does acknowledge that the construction of Montrose Parkway West will result in some harm to the environment.  Therefore, this Court finds that Plaintiffs have presented evidence of the likelihood of irreparable injury, absent this Court granting injunctive relief.[4]

---

[4]  Although this Court does not hold that Plaintiffs are barred by the doctrine of laches, this Court must note that Plaintiffs' delay in bringing this action seems to undermine their claim of irreparable harm.  Plaintiffs' learned about the denial of their motion to stay construction on

IV.    **Harm to Defendants**

Plaintiffs have argued that this Court should discount Defendants' harm because this harm was "self-inflicted" and caused by Defendants' haste. Specifically, Plaintiffs claim that Defendants "jumped the gun" and therefore their harm is not entitled to any equitable consideration. This statement, however, minimizes the harm that Defendants might suffer if this Court entered a preliminary injunction.

Because Montgomery County has initiated construction already, the County would incur substantial costs if this Court enjoins the construction. Halting construction on the Montrose Parkway West would force the County to abandon the site. At first, Montgomery County estimated that it would cost $500,000 for demobilization, another $500,000 for remobilization, and $36,000 for stabilization of the area, with a total cost of $1,061,000 plus $16,700 each day the contractor sits idle. At the hearing, however, Montgomery County's expert, Jeffrey Lindsey ("Mr. Lindsey") testified that any delay in construction may cost the County more than originally thought. In particular, when asked about the effect of halting construction, he stated that stopping construction at this phase would be disastrous. Using the critical path method project management technique, Mr. Lindsey estimated that a thirty-day delay could extend the duration of the Montrose Parkway

_____

October 17, 2005, yet did not file this suit until November 15, 2005, nearly one month after the alleged irreparable harm occurred.
    As a practical matter, it also appears unclear whether the desired relief would prevent some of the possible harms that Plaintiffs assert. Plaintiffs have expressed solicitude for the welfare of the animals in the upland area, but, as Montgomery County has stated, the land next to the proposed roadway is a reserved right of way and would be developed if not otherwise used for road purposes.

West project by one year.[5]   He also testified that the cost of demobilization, stabilization, remobilization, and overhead could reach as much as $100,000 per day.

Montgomery County also has stated that Montrose Parkway West will relieve substandard and congested conditions and has averred that the stretch of road affected by construction of the Montrose Parkway has at least five failing intersections.   As a result, the County believes that "[e]ach day that this important project is delayed, the public, businesses, residences and institutions in the area will be subject to the higher incidence of accidents with the accompanying personal injury and property damages and escalating congestion."

Furthermore, Defendants and Intervenor contend that the entry of a preliminary injunction would result in continuing harm to the environment.   In the Section 404 permit, the Corps observed that the Montrose Parkway West project may have a beneficial impact on existing degraded and sensitive areas.   Montgomery County plans to build a bio-retention facility along Old Farm Creek, south of Tilden Lane, "to treat runoff from 22,500 square feet of impervious surface that currently flows *untreated* into Old Farm Creek." (Emphasis added).   The project would also restore a 1200-foot reach of Booze Creek, located in the watershed of Cabin John Creek, to control bank erosion.

Considering the potential negative impact to Defendants and Intervenor Montgomery County and based on this Court's determination that the Defendants have presented evidence of compliance with NEPA, this Court cannot ignore Defendants' harm.

---

[5]  Mr. Lindsey explained that there are several reason why a short delay could translate into a substantial impact on the completion time of the project.  For example, Article 16 of Maryland's Non-Tidal Wetlands and Waterway Permit prohibits the County from performing construction work within Old Farm Creek and its tributaries between March 1 and June 15. Therefore, any work in those waterways not completed by March 15, 2006 would not resume until after June 15, 2006.

V.      **The Public Interest**

While Plaintiffs assert that granting their motion would protect the environment, wetlands, and various wildlife, Defendants have a countervailing interest in completing this project to relieve traffic and congestion in Montgomery County and to remedy current environmental harms.  At best, either side could argue that the public interest favors their position.

## CONCLUSION

This Court remains sensitive to NEPA's charge to "foster and promote the general welfare [and] to create and maintain conditions under which man and nature can exist in productive harmony."  42 U.S.C. § 4331(a).  As Judge Skelly Wright so aptly stated:

> Several recently enacted statutes attest to the commitment of the Government to control, at long last, the destructive engine of material "progress."  But it remains to be seen whether the promise of this legislation will become a reality.  Therein lies the judicial role.  In these cases, we must for the first time interpret the broadest and perhaps most important of the recent statutes: the National Environmental Policy Act of 1969 (NEPA).  We must assess claims that one of the agencies charged with its administration has failed to live up to the congressional mandate.  Our duty, in short, is to see that important legislative purposes, heralded in the halls of Congress, are not lost or misdirected in the vast hallways of the federal bureaucracy

*Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1111 (D.C. Cir. 1971).  Yet, even when acting in furtherance of this important role, this Court must remain equally mindful of the risk of juriscentrism.  Congress enacted NEPA to ensure that our government weighs the environmental effects of its decisions, but the statute does not specify the precise means to achieve this goal, giving federal and local governments some flexibility.  Where no clear violation of the statute has occurred and where, as here, local and federal officials have followed the letter of the statute, this Court cannot and should not invalidate this process and

substitute its own opinion for that of agency experts.  It is this belief that leads this Court to conclude that the *Blackwelder* factors tip decidedly in favor of Defendants and that Plaintiffs' Motion for a Preliminary Injunction should be denied.

As such, the Court will DENY Plaintiffs' Motion for a Preliminary Injunction [2].  An Order consistent with this Opinion will follow.


December 16, 2005                              /s/
Date                                   Alexander Williams, Jr.
                                       United States District Judge